IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


DATONIA YVETTE DOUGLAS,           )
                                 )
v.                               )        NO. 3:11-0772
                                 )
CAROLYN W. COLVIN,               )
    Acting Commissioner of Social Security[1]   )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

In October 2006, the plaintiff filed applications for SSI and DIB, alleging that she became disabled due to low back pain with a disability onset date of November 1, 2002.[2] (Tr. 10, 27, 106-07, 115, 119.) Her applications were denied initially and upon reconsideration. (Tr. 50-57, 59-62, 70-73.) The plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") John Daughtry on June 25, 2009. (Tr. 25-49.) On March 24, 2010, the ALJ entered an unfavorable decision. (Tr. 10-20.) On June 15, 2011, the Appeals Council denied the plaintiff's request for review (tr. 103-05), thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on August 19, 1967, and she was thirty-five years old as of her alleged disability onset date. (Tr. 29, 106-07.) She has a twelfth grade education and has worked as a fast food cashier, biscuit maker, nursing assistant, and assembler. (Tr. 30, 32, 120, 124, 126-33.)

## A. Chronological Background: Procedural Developments and Medical Records[3]

Dr. Charles Wiggins treated the plaintiff for back pain on a monthly basis from January to October 2006. (Tr. 176-90.) During this treatment period, the plaintiff took Lortab and Soma and regularly received Xylocaine injections, and she frequently reported that this treatment provided

---

[2] The plaintiff's application for SSI is not in the record. However, there appears to be no dispute that the plaintiff applied for both SSI and DIB.

[3] Although the plaintiff alleges a disability onset date of November 1, 2002, the record does not include any medical records predating 2006.

effective pain relief.[4]  (Tr. 176-78, 180, 182-85, 188-90.)  At the plaintiff's first visit, on January 17,

2006, Dr. Wiggins diagnosed her with lumbar radiculopathy, lumbago, sciatica, hip pain, back ache,

and muscle pain.[5]  (Tr. 190.)  In March, Dr. Wiggins added diagnoses for myositis and neuralgia.[6]

(Tr. 188.)  An MRI of the plaintiff's lumbar spine, performed on March 29, 2006, revealed "minimal

degenerative change throughout the lumbar spine with mild articular facet arthrosis only."  (Tr. 187.)

On June 5, 2006, Dr. Wiggins recommended that the plaintiff attend physical therapy.  (Tr. 181.)

On August 3, 2006, Dr. Wiggins wrote a return-to-work letter specifying that the plaintiff should

limit  "long periods of standing" as she could not "stand continuously for more than 30 to 45 minutes

at a time."[7]  (Tr. 179.)

On December 26, 2006, Dr. Ramsey Walker, a Tennessee Disability Determination Services

("DDS") consultative physician, physically examined the plaintiff.  (Tr. 191-94.)  The plaintiff

relayed that she began experiencing back pain in 1988 with "ongoing back pain of intermittent

intensity since then."  (Tr. 191.)  Dr. Walker noted that the plaintiff ambulated with a "normal but

slow gait" and was "able to manipulate well on the examination table without apparent guarding of

any sudden movement of the lumbar spine."  (Tr. 192.)  The plaintiff had normal range of motion

---

[4] Lortab is a narcotic analgesic, Soma is a skeletal muscle relaxant, and Xylocaine is a local anesthetic.  Saunders Pharmaceutical Word Book 415, 653, 770 (2009) ("Saunders").

[5] The Court made every attempt to decipher the medical evidence of record; however, many of Dr. Wiggins' handwritten treatment notes are illegible, and the Court is unable to determine all of Dr. Wiggins' diagnoses on this visit.

[6] Myositis is inflamation of a voluntary muscle.  Neuralgia is pain that extends along the course of one or more nerves.  Dorland's Illustrated Medical Dictionary 1216, 1251 (2003) ("Dorland's").

[7] It is not clear to which job the plaintiff was returning.  She testified that she last worked in 2002.  (Tr. 31.)

in her upper and lower extremities, negative straight leg raises in the supine position, and normal grip strength. (Tr. 193.) She had "significant tenderness" in her lower back but was able to perform standing back flexion to eighty degrees. *Id.* Dr. Walker diagnosed the plaintiff with "[o]ngoing chronic back pain" but noted that she had "[n]o history of lumbar surgery" and "[n]o ongoing medical follow-up." *Id.*

On January 25, 2007, Dr. Anita Johnson, a DDS nonexamining consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 195-202.) Dr. Johnson opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk and sit about six hours in an eight-hour workday, and push and/or pull without limitations. (Tr. 196.) Dr. Johnson also opined that the plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl and had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 197-99.) Dr. Johnson found that the plaintiff's description of the severity of her symptoms was "partially credible" but that Dr. Wiggins' opinion that the plaintiff could stand for no more than 30-45 minutes at a time was "too restrictive" in light of the medical evidence of record. (Tr. 200-01.)

On February 8, 2007, the plaintiff presented to Dr. David Luck, and upon examination, he noted tenderness in her lower back with pain radiating to the left, negative straight leg raising, and positive leg extension. (Tr. 233.) Dr. Luck diagnosed her with hypertension, back pain, and lumbar degenerative disc disease, and he prescribed Soma, Lortab, and physical therapy. *Id.* During follow-up visits in March 2007, the plaintiff relayed that physical therapy was helping and that "overall" her back was "better," but she still experienced "constant pain" in her left leg with "[s]ome sharp pain." (Tr. 231-32.) On April 16, 2007, the plaintiff complained of a possible kidney or bladder infection

4

causing side and back pain, and Dr. Luck recommended a CT scan to rule out kidney stones. (Tr. 230, 265.) The plaintiff also reported that her back was feeling "good" with a back brace, and Dr. Luck refilled her prescriptions for Lortab and Soma. *Id.* On May 3, 2007, the plaintiff returned for a follow-up visit, apparently without having had a CT scan performed, and Dr. Luck scheduled a CT scan and prescribed lisinopril.[8] (Tr. 229, 264.) A CT scan of the plaintiff's abdomen and pelvis on May 24, 2007, showed that she had likely recently passed a kidney stone but was "[o]therwise normal." (Tr. 209, 276.) From May to July 2007, Dr. Luck treated the plaintiff for hematuria,[9] hypertension, and back pain; prescribed lisinopril, verapamil,[10] Lortab, and Soma; and referred the plaintiff to Dr. Drey, a urologist.[11] (Tr. 226-28, 260-63, 293.)

On July 21, 2007, Dr. John Fields, a nonexamining DDS consultative physician, completed a physical RFC assessment and found limitations identical to those identified by Dr. Johnson in January 2007. (Tr. 234-41.) Additionally, Dr. Fields noted that, while the plaintiff's complaints were "partially credible," she had only "minimal deg[enerative] changes of [the lumbar spine] with mild [lumbar range of motion] and pain." (Tr. 241.)

On September 7, 2007, the plaintiff followed up with Dr. Luck for back pain and hematuria, and Dr. Luck recommended a lumbar x-ray and, if the x-ray results were negative, he intended to

---

[8] Lisinopril is an antihypertensive and "adjunctive treatment for congestive heart failure." Saunders at 410.

[9] Hematuria is blood in the urine. Dorland's at 827.

[10] Verapamil is an "antianginal; antiarrhythmic; antihypertensive; calcium channel blocker." Saunders at 751.

[11] The record does not include any treatment notes from Dr. Drey.

refer the plaintiff back to Dr. Drey for an intravenous pyelogram ("IVP").[12]  (Tr. 259.)  On

October 22, 2007, the plaintiff told Dr. Luck that she was having trouble sleeping as well as having

increased pain in her neck and back.  (Tr. 258.)  Dr. Luck added diagnoses of muscle spasms,

insomnia, and overactive bladder and recommended that the plaintiff undergo an IVP to determine

the cause of her urinary and back pain.[13]  *Id.*

The plaintiff presented to the University Medical Center in Lebanon, Tennessee, on

November 7, 2007, with constipation and abdominal pain, but a CT scan of her abdomen and pelvis

showed no significant abnormalities.  (Tr. 274-75.)  In a follow-up visit, Dr. Luck found no

musculoskeletal abnormalities and diagnosed her with constipation.  (Tr. 257.)  On December 5,

2007, Dr. Luck diagnosed the plaintiff with gastroenteritis, and one week later, noted that she was

"feeling much better," diagnosed her with hematuria and back pain, and refilled her prescriptions for

Lortab and Soma.  (Tr. 255-56.)  A January 8, 2008 x-ray revealed a "normal lumbar spine" and "no

evidence of instability on flexion or extension."  (Tr. 273.)  In February 2008, the plaintiff told

Dr. Luck that Lortab was helping her back pain, and the results of an IVP revealed a "questionable

small" kidney stone "producing mild obstruction of the left ureter."  (Tr. 253, 272.)

Between March 2008 and May 2009, the plaintiff presented to Dr. Luck on several occasions

with back pain.  (Tr. 243-52.)  Dr. Luck continued to diagnose hypertension, hematuria, and lumbar

pain and refill prescriptions for Lortab, Soma, lisinopril, and verapamil.  *Id.*  Dr. Luck reported that,

---

[12] An IVP is an intravenous radiograph of the kidney and ureter.  Dorland's at 960, 1549.

[13] Dr. Luck rescheduled the IVP several times before the plaintiff eventually underwent the procedure in February 2008.  (Tr. 253-56, 272.)  It appears that Dr. Luck mistakenly reported in July of 2009, that the plaintiff did not have an IVP until May of 2008.  (Tr. 293.)

in May of 2008, Dr. Drey had recommended a cystoscopy, but the plaintiff no longer had insurance to cover that procedure. (Tr. 293.) In a May 26, 2009, treatment note, Dr. Luck recorded that the plaintiff was sensitive to dust and was unable to stoop, climb stairs, carry more than five pounds, stand more than 10-15 minutes, or sit more than 15-20 minutes. (Tr. 243.)

On June 22, 2009, Dr. Luck completed a Medical Source Statement in which he opined that the plaintiff was unable to work for even one hour a day. (Tr. 280-81.) Dr. Luck reiterated that the plaintiff could not lift any amount of weight on a frequent basis and could only lift five pounds occasionally. (Tr. 280.) He estimated that the plaintiff could sit for fifteen minutes at a time, for a total of sixty minutes during an eight-hour workday, and would occasionally need to elevate her legs. (Tr. 280-81.) He opined that the plaintiff could not stand for any amount of time, although, contradictorily, he also indicated that she could stand for fifteen minutes at a time. (Tr. 280.) He also opined that she could never bend, stoop, balance, work around dangerous equipment, or operate a motor vehicle, and could only occasionally tolerate heat, cold, dust, smoke, fumes, or noise. *Id.* Dr. Luck also indicated that the plaintiff suffered from severe pain that would frequently interfere with attention and concentration and that she would likely miss work four or more days each month. (Tr. 281.)

On July 7, 2009, Dr. Luck wrote a letter in which he summarized the plaintiff's treatment history under his care. (Tr. 293.) He noted that the plaintiff tried physical therapy in 2006 "with minimal improvement" but with "some" improvement in March 2007. *Id.* He relayed that the plaintiff tried a back brace for her arthritis, which initially "made her tired" but "improved the more she used it." *Id.* He also noted that, because the plaintiff's "insurance ran out," he was "unable to do any further testing or evaluation on the [plaintiff's] hematuria or back pain." *Id.* As a result,

Dr. Luck explained, "[w]e are currently treating symptomatically and the [plaintiff] reports she's unable to stand more than 15 minutes before sitting down or sit for more than 15 minutes before walking around. On physical exam, she has been very tender around the lumbar area." *Id.*

On October 29, 2009, Dr. Horace Watson, an examining DDS consultative orthopaedist, physically examined the plaintiff and completed a Medical Source Statement. (Tr. 283-90.) Dr. Watson noted that, at 5' 4" tall and weighing 209 pounds, the plaintiff was overweight and walked with a "slow, cautious gait." (Tr. 283.) Upon examination, Dr. Watson found the plaintiff to have limited range of motion of the lumbar spine but normal spinal curvature, full range of motion of the cervical spine, full range of motion and equal deep tendon reflexes of both upper and lower extremities, negative sciatic stretch and Faber's tests bilaterally, and the ability to stand on her toes and heels without difficulty. *Id.* In his Medical Source Statement, Dr. Watson opined that the plaintiff could lift and/or carry up to twenty pounds frequently and fifty pounds occasionally; sit, stand, and walk for up to two hours each at a time for a total of six hours each during an eight-hour workday; frequently perform hand manipulations and foot control operations; and occasionally perform postural activities. (Tr. 284-87.) He also indicated that the plaintiff did not require a cane to ambulate and could occasionally tolerate exposure to environmental conditions. (Tr. 285, 288.) Finally, Dr. Watson opined that the plaintiff was able to perform activities such as shopping, traveling without a companion, walking without assistance for a short distance at a reasonable pace on rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace using a single handrail, preparing meals and feeding herself, caring for her personal hygiene, and working with papers and files. (Tr. 289.)

On February 16, 2010, Dr. Watson replied to a set of questions submitted by the plaintiff's non-attorney representative regarding his examination of the plaintiff.[14] (Tr. 170, 292.) Dr. Watson indicated that, as part of his examination, he reviewed the plaintiff's March 29, 2006 MRI and Dr. Luck's Medical Source Statement from June 22, 2009, but that these reports did not influence his assessment of the plaintiff's functional ability. (Tr. 292.) Dr. Watson also noted that he performed a sciatic stretch test, also known as a straight leg raising test, on the plaintiff while she was in a seated position, and that his opinion as to the plaintiff's lumbar range of motion was based upon the range of motion that the plaintiff "voluntarily accomplish[ed] when asked to do so." *Id.* Dr. Luck added that his "assessment of the [plaintiff's] work-related activities consist[ed] of my opinion regarding what the [plaintiff was] capable of doing and [was] not necessarily related to the voluntary active range-of-motion that the [plaintiff was] willing to accomplish while being examined." *Id.*

**B. Hearing Testimony**

At the hearing on June 25, 2009, a non-attorney representative appeared on behalf of the plaintiff, and the plaintiff and Michelle McBroom-Weiss, a vocational expert ("VE"), testified. (Tr. 25-49.) The plaintiff testified that she had a twelfth grade education, was separated from her husband, and lived alone in an apartment. (Tr. 29-30.) She testified that she was last employed in 2002 as a cashier and biscuit maker at Hardee's and had also worked as a "tech" at a nursing home and as an assembly worker. (Tr. 31-32.)

---

[14] The plaintiff's non-attorney representative at that time also represented her during the hearing in front of the ALJ. (Tr. 25-49, 169-70.) She has since obtained an attorney to represent her. Docket Entry No. 16-1, at 9.

The plaintiff testified that she could no longer work due to pain in her lower back that began in 1992 and continued "off and on" since then. (Tr. 34.) She explained that the low back pain radiated into her left leg, causing "sharp," "throbbing" pain and numbness. (Tr. 34-35, 40.) She relayed that she experienced this pain "basically every day" and that the pain was worse when she was active such as during physical therapy. (Tr. 35, 40, 42.) The plaintiff rated her pain at approximately a 7 on a 10 point pain scale while she was taking medications and said that her pain medications made her "groggy." (Tr. 35-36.) She testified that she received injections in her back but that they had "[n]ot really" helped relieve her pain. (Tr. 42.) She also reported that she had tried using a "TENS" unit,[15] but that it did not provide relief and that home remedies, such as heating pads, did little to relieve her pain. (Tr. 42-43.)

The plaintiff testified that she could stand for 10-15 minutes before needing to sit down, and that, during an eight-hour workday, she could stand for a total of 30-60 minutes. (Tr. 41.) She estimated that she could sit for 10-15 minutes at a time and for 30-60 minutes total during an eight-hour workday. *Id.* She also testified that she could not lift anything heavier than five pounds and that her pain limited her ability to bend and prevented her, for example, from stooping to pick up a pot. (Tr. 39, 41-42.) The plaintiff reported that she attended church but could not sit comfortably during an entire forty-five minute sermon. (Tr. 37-38.) The plaintiff said that, other than attending

---

[15] Transcutaneous electrical nerve stimulation ("TENS") therapy is used to relieve pain through the use of low-voltage electrical current. WebMD, "TENS," http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nervestimulation-tens-topic-overview.

church, she did not socialize, she no longer had any hobbies, and she watched television for 12-14 hours a day. (Tr. 37-38.)

The VE classified the plaintiff's past work as an assembler as light and unskilled; as a biscuit maker as medium and skilled; as a fast food cashier as light and unskilled; and as a nurse's assistant as medium and semi-skilled. (Tr. 45.) The ALJ asked the VE whether a hypothetical person with the plaintiff's education and work history would be able to perform the plaintiff's past work if that person was able to:

> lift 50 pounds on an occasional basis, 25 pounds on a frequent basis. Can stand or walk for up to six hours in an eight-hour workday, can sit for up to six hours in an eight-hour workday, can engage in unlimited pushing and pulling. Can engage in frequent postural activities, climbing, balancing, stooping, kneeling, crouching or crawling and can otherwise perform a full range of medium work from a physical standpoint. The hypothetical individual could reasonably be expected to experience pain but can understand, remember and carry out simple and detailed directions and can maintain concentration and persistence necessary to perform simple and detailed tasks.

(Tr. 45-46.) The VE responded that such a person would be able to return to any of the plaintiff's past jobs. (Tr. 46.) Next, the ALJ asked the VE whether a hypothetical person would be able to perform any of the plaintiff's past work if that individual could "stand and/or walk for two hours in an eight-hour workday, can engage in occasional pushing and pulling, [and] can engage in occasional postural activities, climbing, balancing, stooping, kneeling, crouching and crawling." *Id.* The VE answered that an individual with such limitations would not be able to perform the plaintiff's past work but could perform other jobs in the national or regional economy such as light cashier or sedentary cashier. (Tr. 46-47.) The VE also testified that a person with the limitations outlined in Dr. Luck's Medical Source Statement would be unable to perform any work. (Tr. 47.)

# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on March 24, 2010. (Tr. 10-20.) Based upon the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2004.

2. The claimant has not engaged in substantial gainful activity since November 1, 2002, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. Through the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. (20 CFR 404.1520(c)).

\*\*\*

4. Since October 3, 2006, the claimant's mild lumbar degenerative disc disease and obesity have not only been a medically determinable impairment but have also been "severe" (20 CFR 416.920(c)).

\*\*\*

5. Since October 3, 2006, the claimant has not had an impairment or combination of impairments that has met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

6. Since October 3, 2006, the claimant could perform medium work as defined in 20 CFR 416.967(c) except for standing and/or walking for six hours in an eight hour workday with normal breaks; sitting for six hours in an eight hour workday with normal breaks; unlimited pushing/pulling; and performing frequent postural activities of climbing, balancing, stooping, kneeling, crouching or crawling. She could also understand, remember, and carry out simple and detailed instructions and could concentrate and persist enough to perform simple and detailed tasks due to pain and other symptoms.

\*\*\*

7. Since October 3, 2006, the claimant could perform her past relevant work as a nurse assistant, a biscuit maker, a fast food cashier, and an assembler. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

\*\*\*

8. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2002, through the date of this decision (20 CFR 404.1520(c) and 416.920(f)).

(Tr. 16-20.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education, or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found

disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that she can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs the plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the

plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 16.) At step two, the ALJ determined that the plaintiff had the severe impairments of lumbar degenerative disc disease and obesity.[16] (Tr. 17.) At step three, the ALJ found that the plaintiff's impairments did not meet or medically equal a listed impairment. *Id.*

---

[16] In her memorandum in support of her motion, the plaintiff indicates that she alleges disability on the "basis of a combination of impairments, including low back pain with radiculopathy, articular facet arthrosis, . . . degenerative disc disease of the lumbar spine; left ventricular hypertrophy with mild mitral and tricuspid regurgitation, and hypertension." Docket Entry No. 16-1, at 2. However, she does not provide a cite to the record in support of that statement. It appears to the Court that the plaintiff asserted disability only on the basis of back problems. (Tr. 119.) Nevertheless, the ALJ addressed the plaintiff's lumbar radiculopathy and cardiovascular impairments, in addition to her kidney, bladder, urinary tract, and gynecological conditions, and found them to be not severe. (Tr. 17.)

At step four, the ALJ found that the plaintiff could perform her past relevant work as a nurse assistant, biscuit maker, fast food cashier, and assembler. (Tr. 19.)

### C. The Plaintiff's Assertion of Error

The plaintiff argues that the ALJ erred by rejecting the opinion of Dr. Luck, her treating physician, and failing to provide good reasons for doing so. Docket Entry No. 16-1, at 1, 5-8. Given the regularity with which Dr. Luck examined the plaintiff (tr. 226-33, 243-78, 293), he is classified as a treating source under 20 C.F.R. §§ 404.1502 and 416.902.[17] Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

---

[17] A treating source is defined in 20 C.F.R. §§ 404.1502, 416.902 as:

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[18] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

---

[18] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[19] *Wilson*, 378 F.3d at 544-45.

In his Medical Source Statement, Dr. Luck opined that the plaintiff could lift five pounds occasionally but no amount of weight frequently; sit for fifteen minutes at a time for one hour in total during an eight-hour workday; stand for fifteen minutes at a time but not even for one hour in total during an eight-hour workday; occasionally tolerate heat, cold, dust, smoke, fumes, and noise; and never work around dangerous equipment, operate a vehicle, stoop, or balance. (Tr. 280.) Dr. Luck did not believe the plaintiff could complete even one hour of work per day. *Id.* The ALJ gave Dr. Luck's opinion little weight, explaining that:

> [I]t is notable that Dr. Luck did not provide any basis for his opinion. Dr. Luck's opinion does not cite any objective evidence or clinical examination findings and is generally devoid of any explanation regarding opined limitations. Dr. Luck's assessment form appears to be based *solely upon the claimant's subjective statements.* Dr. Luck's opinion is not well supported [and] is significantly inconsistent with other evidence in the record.

(Tr. 19.) (Emphasis in original.)

After reviewing the record, the Court concludes that the ALJ properly assessed Dr. Luck's medical opinion. First, as the ALJ noted, Dr. Luck's opinion lacks support. The Regulations provide that "supportability," i.e., explanation and relevant evidence presented to support an opinion, is a factor to be considered when evaluating medical opinions. 20 C.F.R. §§ 404.1527(c)(3); 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion,

---

[19] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give the opinion.").

In his Medical Source Statement, Dr. Luck did not offer any explanation for his opinions and did not refer to any objective evidence or clinical findings in support of his conclusions. (Tr. 280-81.) Dr. Luck merely circled limitations on a preprinted form without further elaboration. Notably, in a space provided on the form to list findings supporting his conclusions, Dr. Luck did not provide any supporting information. (Tr. 281.) In a letter submitted after the hearing, Dr. Luck indicated that his opinions about how long the plaintiff could stand and sit were based on the plaintiff's own reports. (Tr. 293.) Nor do Dr. Luck's treatment records support the significant limitations that he placed on the plaintiff. His treatment notes generally reflect unremarkable examinations and conservative treatment. (Tr. 226-33, 243-78, 293.) Over the course of her treatment with Dr. Luck, the plaintiff reported that physical therapy, medication, and the use of a back brace were "helping" and that overall her back was improving. (Tr. 231-32, 251, 253, 255, 293.) Objective testing such as CT scans, MRIs, and x-rays all revealed essentially normal results, with the most significant finding, in 2006, being "minimal degenerative change throughout the lumbar spine with mild articular facet arthrosis only." (Tr. 187, 209, 273-276.) Dr. Luck's treatment notes do not support the severity of limitations that he placed on the plaintiff.

Second, the Court agrees with the ALJ's conclusion that Dr. Luck's opinion is "significantly inconsistent" with the other medical evidence of record. (Tr. 19.) In addition to rather insignificant objective testing and a mild treatment history, the record also contains functional assessments from Drs. Johnson and Fields, two DDS nonexamining consultative physicians, and Dr. Watson, an

examining consultative orthopaedic specialist. (Tr. 195-202, 234-41, 283-89, 292.) Each of these doctors found limitations that were much less severe than those found by Dr. Luck.

Drs. Johnson and Fields both opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push and/or pull without limitations; frequently balance, stoop, kneel, crouch, and crawl; and had no manipulative, visual, communicative, or environmental limitations. (Tr. 196-99, 235-38.) Dr. Watson opined that the plaintiff could lift and carry twenty pounds frequently and fifty pounds occasionally; sit, stand, and walk up to two hours at a time for a total of six hours each during a workday; frequently perform hand manipulations and foot control operations; occasionally perform postural activities; and occasionally tolerate exposure dust, humidity, extreme temperatures. (Tr. 284-88.) As the ALJ noted, the opinions of Drs. Johnson, Fields, and Watson are largely consistent with each other and are more in line with the medical evidence, which showed generally unremarkable clinical findings.

The plaintiff contends that the ALJ should not have credited Drs. Fields, Johnson, and Watson over Dr. Luck because the consultative physicians did not have access to her complete medical record. Docket Entry No. 16-1, at 6-7. Specifically, the plaintiff argues that Drs. Johnson and Fields, who completed their RFC assessments in 2007, were unable to review Dr. Luck's 2009 Medical Source Statement and that Dr. Watson "did not see any of Dr. Luck's treatment records."[20] *Id.* at 6.

_____

[20] Dr. Watson did review Dr. Luck's Medical Source Statement. (Tr. 292.)

In support of her argument, the plaintiff cites Social Security Ruling 96-6p, which provides that the opinions of DDS consultants "can be given weight only insofar as they are supported by evidence in the case record." Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *2. Ruling 96-6p continues by noting that:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or phychological [*sic*] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3.

The plaintiff apparently construes Ruling 96-6p to require that, in order for the ALJ to accept the opinion of a State agency medical consultant over the opinion of a treating source, the consultant's opinion must be based on a review of the complete case record. However, no such requirement exists. The Sixth Circuit recently addressed this issue, noting that Ruling 96-6p provides one example but "does not exhaust the range of 'appropriate circumstances' under which a non-treating source's opinion may be entitled to greater weight than that of a treating source." *Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. Jan. 4, 2011). Rather, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" and "need only be 'supported by evidence in the case record.'" *Id.* (quoting Soc. Sec. Rul. 96-6p).

The ALJ chose not to adopt Dr. Luck's Medical Source Statement because Dr. Luck "did not provide any basis for his opinion," did "not cite any objective evidence or clinical examination findings," did not offer "any explanation regarding opined limitations," based his limitations "solely upon the claimant's subjective statements," and offered an opinion that was "significantly inconsistent with other evidence in the record." (Tr. 19.) These are "good reasons" for discounting Dr. Luck's opinion. The ALJ instead chose to give Dr. Johnson's and Dr. Fields' opinions the most weight because both doctors had "considered the claimant's MRI results and medical history"[21] and their opinions were "completely consistent with each other." (Tr. 19.) The ALJ also gave Dr. Watson's opinion "significant weight" after noting that he was an orthopaedic specialist who had examined the plaintiff and offered an opinion that was "consistent with the evidence." *Id.* The ALJ's explanation for favoring the opinions of Drs. Johnson, Fields, and Watson shows that he appropriately considered their opinions and found them to be supported by evidence in the case record. The Court concludes that the ALJ complied with the treating source rules and that his decision is supported by substantial evidence in the record.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 16) be DENIED and the Commissioner's decision be AFFIRMED.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with

---

[21] Of course, the DDS consultative physicians could only consider the medical records in existence at the time of their respective reviews.

particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge